[No. 13503.   In Bank. — August 4, 1890.]

MARY II. WALDRON, Respondent, *v*. DAVID V. WALDRON, Appellant.

Divorce — Extreme Cruelty — Mental Suffering — Effect upon Bodily Health — Construction of Civil Code. — Section 94 of the Civil Code is not a proper legal definition of extreme cruelty as a ground for divorce, as used in section 92 of the Civil Code, since it entirely omits the essential attribute of wrong or injustice. The probable object of the legislature, in enacting that section, was to affirm the rule of previous decisions, that extreme cruelty may be inflicted without as well as with physical violence; but not to disturb the rule of those decisions, that the final test of the sufficiency of ill treatment acting on the mind, as a cause of divorce, must be its actual or reasonably apprehended injurious effect upon the body or health of the complaining party. (McFarland, J., and Paterson, J., dissenting.)

Id. — Definition of Extreme Cruelty. — Extreme cruelty, whether effected by physical violence, or by ill treatment operating primarily upon the mind, is limited to such treatment and conduct as produce bodily harm or ill health, or furnish reasonable apprehension that further cohabitation would endanger the life or physical health of the complaining party. (McFarland, J., and Paterson, J., dissenting.)

Id. — Grievous Mental Suffering — Insufficient Finding. — Grievous mental suffering is not the equivalent of extreme cruelty in a legal sense, nor is extreme cruelty a necessary inference from the infliction of grievous mental suffering, and it follows that a finding of grievous mental suffering is not a finding of extreme cruelty.

Id. — Mental Suffering from Epithets not Affecting Health — Insufficient Finding. — A finding that the defendant, when intoxicated, unjustly, and without sufficient provocation, called the plaintiff vile names in the presence of others, qualified by other findings that the plaintiff was not uniformly kind to the defendant, and that she was not without fault when he called her such names, and that her health was not injured thereby, does not stand the final test of sufficiency, as it does not affirmatively show any actual or reasonably apprehended injurious effect of the language used upon the body of the plaintiff.

Appeal — Reversal of Judgment upon Findings — New Trial — Direction to Court below. — Where, upon the findings of fact, the judg-

ment should have been for the defendant, and the case appears to have been thoroughly tried as to the facts, and it appears very improbable that a new trial would result more favorably to the plaintiff, the judgment will be reversed by the supreme court, and the court below directed to render judgment for defendant.

APPEAL from a judgment of the Superior Court of Los Angeles County, and from an order denying a new trial.

The facts are stated in the opinion.

*Smith, Winder & Smith,* for Appellant.

The conduct should be sufficiently aggravated to produce ill health or bodily pain, though operating primarily upon the mind only, to be regarded as cruelty. (*Powelson* v. *Powelson*, 22 Cal. 358; *Poor* v. *Poor*, 8 N. H. 307; 29 Am. Dec. 664; *Pierce* v. *Pierce*, 3 Pick. 299; 15 Am. Dec. 213.)

*Wells, Guthrie & Lee,* for Respondent.

The public aspersion of a virtuous wife by her husband, charging her with unchastity, constitutes such cruelty as will entitle her to a divorce. (*Jones* v. *Jones*, 60 Tex. 451; *Bahn* v. *Bahn*, 62 Tex. 518; 50 Am. Rep. 539; *Williams* v. *Williams*, 67 Tex. 198; *Kelly* v. *Kelly*, 18 Nev. 49; 51 Am. Rep. 733; *Wheeler* v. *Wheeler*, 53 Iowa, 511; 36 Am. Rep. 240; *Allen* v. *Allen*, 31 Mo. 479; *Goodman* v. *Goodman*, 26 Mich. 417; *Lewis* v. *Lewis*, 5 Mo. 278.) Profane, obscene, and insulting language habitually indulged toward a wife, a person of a sensitive nature and refined feelings, amounts to extreme cruelty. (*Bennett* v. *Bennett*, 24 Mich. 483; *Goodman* v. *Goodman*, 26 Mich. 417; *Wheeler* v. *Wheeler*, 53 Iowa, 515; 36 Am. Rep. 240; *Allen* v. *Allen*, 31 Mo. 480; *Whitmore* v. *Whitmore*, 49 Mich. 417.) It is cruelty for a husband to call a sensitive and refined wife a bitch. (*Warner* v. *Warner*, 54 Mich. 492.) Unjustifiable conduct on the part of the husband, which so grievously wounds the mental feelings of the wife, or so utterly destroys her peace of mind

as to impair her health, or endanger her life, or such as utterly destroys the legitimate ends and objects of matrimony, constitutes extreme cruelty. ( *Wachholz* v. *Wachholz*, 75 Wis. 377; *Avery* v. *Avery*, 33 Kan. 1; *Carpenter* v. *Carpenter*, 30 Kan. 712; 46 Am. Rep. 108; Civ. Code, sec. 98.)

VANCLIEF, C. — This is an action for divorce on the ground of extreme cruelty, by the use of vile and offensive language, without any physical force or violence applied to the person of the plaintiff.

The answer of the defendant denies the cruelty and the use of the language alleged. The court found for the plaintiff, and decreed a divorce and permanent alimony of one hundred dollars per month while she shall remain unmarried, and one thousand dollars for her attorneys' fees; and defendant appeals from the judgment, and from an order denying his motion for a new trial.

The material substance of the findings as to extreme cruelty is as follows: —

That, upon occasions when the defendant was intoxicated, he wrongfully and unjustly, and without sufficient provocation to justify him in so doing, called the plaintiff vile names, once called her a " whore," and on several different occasions called her a "damned bitch," and a " damned witch from hell," in the presence and hearing of other people, and thereby inflicting upon her grievous mental suffering, but without injury to her health; that when he called her such vile names she was not without fault, and that she was not uniformly kind to him; that there is reasonable apprehension to believe that such cruel treatment will be continued if a divorce is not granted.

The defendant contends, — 1. That these findings as to cruelty do not support the judgment; and 2. That they are not justified by the evidence.

1. As to the sufficiency of the finding, it is to be ob-

served that the degree of cruelty which the law recognizes as a cause of divorce never has been exactly defined. Perhaps as near an approach to an exact definition as is practicable is made by Mr. Bishop, who, admitting the great difficulty of formulating such a definition, thinks the task not impossible, and gives, as his definition, the following:—

"Cruelty is such conduct in one of the married parties as, to the reasonable apprehension of the other or in fact, renders cohabitation physically unsafe, to a degree justifying a withdrawal therefrom." (1 Bishop on Marriage and Divorce, 6th ed., sec. 717.)

Yet this expression of the degree of cruelty which may justify a withdrawal from cohabitation seems to leave it quite as indefinite as was the degree which will justify a divorce without aid from this definition; and the learned author seems to admit as much, further on (sec. 740), where, referring to this definition, he says: "By our definition of cruelty, the apprehension of physical danger to the complaining party must, to justify a divorce, have proceeded 'to a degree justifying a withdrawal from cohabitation.' Now, if this seems indefinite, so is the law. There is no possibility of measuring the depth of woe or danger thus required, except by the understandings of the men who occupy the bench and the jury-box, enlightened and strengthened by what has been heretofore deemed or adjudged."

Certainly, where the fact upon which the law is to operate is indefinite, the law is necessarily indefinite and uncertain to the same degree; and generally, uncertainty of the law proceeds from uncertainty as to the ultimate matter of fact which forms a part of and a term in every proposition of law. True, it is sometimes uncertain whether a law is mandatory or merely directory or permissive, but much oftener the "uncertainties of the law" arise from uncertainties as to the facts or things commanded, permitted, or prohibited; and so it is with

the fact of cruelty prohibited by the law governing the marriage relation. Since all degrees of cruelty are not prohibited, and the requisite degree to bring it within the prohibition being uncertain, the law prohibiting it must be correspondingly uncertain.

But although the degree of cruelty constituting a ground for divorce may not have been exactly defined, it has been so described by the decisions of courts that it may be sufficiently identified for practical purposes; and although the judicial descriptions of what is and what is not a sufficient degree of cruelty do not reduce the distinction to a line clearly separating the sufficient from the insufficient degrees of cruelty in all possible cases, they reduce it to a very narrow zone, within which the true line of distinction is to be judicially ascertained or sufficiently approximated, by means of the peculiar circumstances of each case, viewed in the light of "what has been heretofore deemed or adjudged." A great majority of the cases, however, will be found to fall within the authoritative descriptions of either the requisite or the insufficient degree of cruelty.

It is contended, however, by counsel for respondent, that extreme cruelty is defined by section 94 of the Civil Code, and that the finding in this case, being in the language of that section, must be sufficient. That section is as follows: —

"Extreme cruelty is the infliction of grievous bodily injury, or grievous mental suffering, upon the other by one party to the marriage."

If this section is to be considered a proper legal definition of the words "extreme cruelty," as used in section 92 of the same code, it certainly deprives those words of an essential part of their meaning as used in the books to express a cause of divorce, since it entirely omits the attribute of wrong or injustice. "The infliction of grievous bodily injury or grievous mental suffering" does not imply wrong or injustice, and it may be justi-

fiable; whereas the word "cruelty," alone, is always understood as implying wrong or injustice;· and the "extreme cruelty" which is a cause of divorce is necessarily wrong, and never justifiable. Therefore, to say that section 94 of the Civil Code was intended as a complete definition of the words "extreme cruelty," as used in section 92, would be to affirm that the mere "infliction of grievous mental suffering," though excusable or justifiable, is a cause of divorce, — an absurdity not to be attributed to the legislature. The probable object of the legislature, in enacting section 94 of the Civil Code, was to affirm the previous decisions of the supreme court of this state in the cases of *Morris* v. *Morris*, 14 Cal. 78, 73 Am. Dec. 615, and *Powelson* v. *Powelson*, 22 Cal. 360, to the effect that extreme cruelty may be effected without as well as with physical violence, and thus to settle the law on a point as to which there was thought to be some contrariety of judicial opinion in other states and in England. Surely it was not intended to disturb those decisions; for although they limit the rule that extreme cruelty may be the result of treatment other than that of physical violence to such treatment and conduct as produce bodily harm or ill health, or furnish reasonable apprehension that further cohabitation would endanger the life or physical health of the complaining party, yet they extend the rule quite as far as it has gone elsewhere in the United States or in England.

Although the character of the ill treatment, whether it operates directly upon the body or primarily upon the mind alone, and all the attending circumstances, are to be considered for the purpose of estimating the degree of the cruelty, yet the final test of its sufficiency, as a cause of divorce, must be its actual or reasonably apprehended injurious effect upon the body or health of the complaining party. (1 Bishop on Marriage and Divorce, 6th ed., secs. 732–733 b; *Morris* v. *Morris*, 14 Cal. 80; 73 Am. Dec. 615; *Powelson* v. *Powelson*, 22 Cal. 362.) This

is the only practically safe rule.   The grave remedy of
divorce is disproportioned to the petty marital wrongs
and annoyances whose injurious effect upon the body or
health cannot be shown and sensibly appreciated, and
it is not to be administered on the ground of cruelty,
except in conservation of life or health.   Many of such
wrongs and annoyances, productive of more or less
unhappiness, must be borne, if they cannot be justly
remedied or avoided by the parties themselves.   The
following passage from Lord Stowell's opinion in *Evens*
v. *Evens*, 4 Eng. Ecc. 310, delivered one hundred years
ago, has ever since been regarded and cited as sound
law, both in England and the United States: —

"Mere austerity of temper, petulance of manners, rude-
ness of language, a want of civil attention and accommo-
dation, even occasional sallies of passion, if they do not
threaten bodily harm, do not amount to legal cruelty;
they are high moral offenses in the marriage state un-
doubtedly, not innocent surely in any state of life, but
still they are not that cruelty against which the law can
relieve.   Under such misconduct of either of the parties,
— for it may exist on one side as well as on the other, —
the suffering party must bear in some degree the conse-
quences of an injudicious connection; must subdue by
decent resistance or by prudent conciliation, and if this
cannot be done, both must suffer in silence.   And if it
be complained that by this inactivity of the courts much
injustice may be suffered and much misery produced,
the answer is, that courts of justice do not pretend to
furnish cures for all the miseries of human life.   They
redress or punish gross violations of duty, but they go
no further; they cannot make men virtuous; and as the
happiness of the world depends upon its virtue, there
may be much unhappiness in it which human laws
cannot undertake to remove.   Still less is it cruelty,
where it wounds, not the natural feelings, but the ac-
quired feelings, arising from particular rank and situ-
LXXXV. CAL.—17

ation; for the court has no scale of sensibilities by which it can gauge the *quantum* of injury done and felt, and therefore, though the court will not absolutely exclude considerations of that sort, where they are stated merely as matter of aggravation, yet they cannot constitute cruelty where it would not otherwise have existed."

Speaking of this passage, and of cruelty inflicted by other means than physical violence, Mr. Bishop says (sec. 725): "And though the court may not, as Lord Stowell said, have 'any scale of sensibilities by which it can gauge the *quantum* of injury done and felt,' it may sometimes perceive that it is greater than can be practically endured, as well when falling on the mind as on the body. Equally, whether of the one sort or the other, the court must be made affirmatively to perceive that cruelty exists in fact, and is sufficient in degree, before it can grant the remedy." Yet the practical view of the law is, that a degree of cruelty which cannot be perceived to injure the body or the health of the body, "*can* be practically endured," and *must* be endured, if there is no other remedy than by divorce; because no "scale" by which to gauge the purely mental susceptibilities and sufferings has yet been invented or discovered, except such as indicate the degrees thereof by their *perceptible* effects upon the physical organization of the body.

From the foregoing considerations, it follows that the findings of fact are not sufficient to sustain the judgment. "Extreme cruelty" is not expressly found in any sense; nor does it, in the legal sense above described, follow, as a necessary inference, from the facts found. The finding of "grievous mental suffering" is, and purports to be, only an inference or conclusion from the opprobrious language found to have been used by the defendant. In the case of *Smith* v. *Smith*, 62 Cal. 466, in which the only issue was as to the fact of extreme cruelty, it appeared that the trial court, after finding the acts claimed to have constituted extreme cruelty, con-

cluded as follows: "That the repeated acts of cruelty, as established by the evidence, upon the part of said defendant toward her said husband and children during the last several years, *have inflicted upon the plaintiff grievous mental suffering."* Held, that this finding "is but a conclusion of law, and does not find any fact in issue in the case." Now, whether this finding is a conclusion of law or a conclusion of fact, the decision that it is not a finding of any fact in issue is correct, though the fact of extreme cruelty was in issue; because, as we have seen, the infliction of grievous mental suffering is not the equivalent of extreme cruelty in a legal sense, nor is extreme cruelty a necessary inference from the infliction of grievous mental suffering, since the latter may be excusable, and even justifiable, while the former never is so.

Although the evidence is conflicting as to the finding that the defendant, when intoxicated, unjustly, and without *sufficient* provocation, once called the plaintiff a whore, and several times a bitch, and a witch from hell, in the presence of other people, yet this finding is justifiable by the rule applicable to findings upon conflicting evidence; but, qualified as it is by the further findings that the plaintiff was not uniformly kind to the defendant, that at the times when he called her those vile names she was not without fault, and that her health was not injured thereby, it does not stand the final test of its sufficiency, as it does not affirmatively show any actual or reasonably apprehended injurious effect of the language used upon the body or health of the plaintiff, and therefore it could not have been affirmatively perceived by the court that the cruelty was sufficient in degree. Upon the findings of fact, I think the judgment should have been for the defendant; and as the case appears to have been thoroughly tried as to the facts, it appears very improbable that a new trial would result more favorably to the plaintiff. (*Ford* v. *Chambers,* 28 Cal. 13.)

A careful examination of the evidence will show that it is barely sufficient to justify even the insufficient findings, and that there are many circumstances tending to qualify the facts found in favor of the defendant, and to mitigate their effect upon the plaintiff's mind.

Both parties had been married before. The plaintiff had three children by her former marriage, aged, respectively, seven, nine, and eleven years, but the defendant had no children by his former marriage. The plaintiff had about two thousand five hundred dollars, and defendant had property worth about one hundred thousand dollars, at the time of their marriage. The intemperate habits of the defendant, such as they were after marriage, were known to plaintiff before marriage, and she testified that she once broke off her engagement to marry him on that account; and as a condition of renewing it, she required him to sign a written pledge to her, not that he would not drink, but only that he would not drink to excess, and that his hand trembled from the effect of drink at the time he signed the pledge. Soon after the marriage, plaintiff's niece, then a young unmarried lady, came to live with them, and remained until she was married, on July 25, 1888, nearly three months after the commencement of this suit; for it appears that the plaintiff continued to reside in defendant's house up to the time of trial, as before, except that he occupied a separate room from hers. The defendant kept his pledge until about two months after marriage.

The niece, Mrs. Albee, testified as to the first time he became intoxicated after marriage, as follows: "When I first came down I was very much pleased with my aunt's choice; he was apparently a gentleman, and acted the gentleman for quite a while, until, probably six weeks afterward, we came home and found him in a state of intoxication, in the hall, and my aunt remonstrated with him after he got into the room, and he became very angry and swore a great deal; . . . . she remonstrated

with him, and said to him, 'Do you remember the prom-
ise you made to me?' He said, 'My promise outside of
a business transaction does not amount to anything.'"
As to how often after this first scene he became intoxi-
cated or called her vile names the evidence is indefinite.
The plaintiff testified that it may have been two or three
times a month, but probably oftener.  She could not tell
how often, but that the first time he called her a whore,
or bitch, was during the holidays, when he came home
intoxicated late at night, upon which occasion the prin-
cipal quarrel seems to have occurred, and as to which
the plaintiff, in part, testified as follows: "I would not let
him in the room at night; . . . . that was the first occa-
sion that happened, and he was going to kick in the door
. . . . I never have seen him quite so mad as that before;
then I was nervous; I did not know; I was all alone in
the house; my little girl was in the room with me; my
niece was at the theater with Mr. Albee.  My little girl
heard a noise in the house, and asked me if she could
come in my room.  I told her she could come until Mr.
Waldron came.  I says: 'If he comes home sober, you
will have to go to your own room; if he comes home
drunk, you can stay.' . . . . We heard something in the
hall as if somebody fell.  He came to my door, and de-
manded to come in; I told him he could not come in.
. . . . He said he wanted some quilts; I said I had no
quilts, only what was on my bed.  I told him if he had
come home sober he could have come in.  He says,
'Open this door,' and went on damning, and cursing,
and swearing, and I thought I would scare him and call
a policeman.  I raised the window.  There was no po-
liceman around there.  When I called the policeman
he says, 'You damn bitch, you damn whore, you damn
trump,' or something like trump.  I says, 'I will not
stand that in the world.'  I was paralyzed; I never
thought Mr. Waldron would call me any such names as
that.  When he called me these names first, it almost

paralyzed me. Then the colored girl heard him down-
stairs, and she came up and tried to get him down-stairs;
he went down and sat in the parlor by the fire. . . . . It
was about the holidays, either the last part of December
or a little after New-Year's. I cannot exactly tell when
the next time was. Of course I did not feel very kindly
toward him after he called me those names, and when I
got him sober, I gave him a piece of my mind about it.
He was sitting at the head of the table, and I says to
him: 'You have called me the very worst kind of names
the other night, and remember, I will never stand that';
I says, 'I have not done anything to deserve any such
names as that, and you can't do that'; I says, 'Probably
you are calling me after the women that you have been
used to associate with all your life; it comes natural; but
remember, you cannot call me any such names as that.'
He spoke of his property at Washington Gardens, and
says, "Look at the wealth ahead of you'; I says, 'The
wealth ahead of me don't license you to call me any such
names.' He says, 'If you leave me you will go to the
poor-house.' It was no use for me to talk to him at all
about it. He behaved himself for a little while,—about
a week or so he behaved himself,—kind of staid sober,
—did not drink much,—he kind of thought I would do
something, I guess. Then I guess he thought I would
not. I don't know what it was,—in the hall up-stairs,
—anyhow, he says, 'You are a damn whore, anyhow.'
Just then I leaned over the banister and saw my niece
on the stairs, and I says, 'Jennie, did you hear what he
called me?' She says, 'Yes, I did.' He says, 'O, well, I
will take it back.' . . . . 'When he thought she heard
him, he says, 'I will take it back.' I says, 'You better
take it back.'"

It appears that there was no spare bed in the house at
the time she barred him out of her room, their spare
bedroom not being fully furnished at that time.

On cross-examination, plaintiff said: "The time there

was a fuss about the quilts was the first time he called
me names. . . . . When I told him he could not come
in he says, 'I want some quilts.' I says, 'I have none
in here, only what is on my bed, and if you had come
home sober, sir, you could come in, and have quilts, where
you belong.' "

Being asked by her counsel if she ever did anything
to provoke him or seek quarrels with him, she answered:
"He would come home drunk, you know; I would say,
'Now, Dave Waldron, now you are drunk again'; I
would go on, and I said, 'Now, you know very well the
promise you made me, and the condition upon which I
married you, and you have broken that promise, and
you know you took an oath to me, and you kept sober,
before you married me, for months.' . . . . If he would
come home drunk and fall in the doorway, and lay in
the hall so we could not get him up, when my niece in-
vited company, we had to send over to Mansfield to take
him off of the floor; he has fallen in the front door so
the whole house shook. When he would come home so,
I was a little bit provoked, you know; then I would
think it was my time to talk to him, and tell him what
he was doing; he could not enjoy his money, and when
he would get to drinking, he would kill himself. I would
tell him about his soul and the hereafter; then he would
answer me in the most terrible blasphemous remarks,
when I would begin anything about religious subjects.
. . . . At one time, I don't know as he had much liquor,
. . . . I made the most solemn appeal to him in the
dining-room. When I got through he knew I was
right. . . . . When I made this eloquent appeal to
him, he picked up his head and said, 'You are a damned
fool.' My appeal was all right, but it was foolish to ap-
ply it to him. . . . . All I would do, I would talk to him,
you know, and sometimes I would scold him. . . . . I
says, 'Did n't your first wife ever scold you about your
actions generally, and try to make you do what was right?

Did n't she scold like I do?' He said: 'She scolded louder and faster than you do, but she did not spread it on quite so thick,' meaning it was not to the point, as mine was."

Mrs. Albee, the niece, testified: "I think it was after Christmas that his language and conduct was most vile, — well, almost up to the time and *after she applied for a divorce.*" So it seems that the plaintiff and her niece remained in the house with him, and that the quarreling was kept up, after the suit for divorce had been commenced,— the niece remaining until she was married, nearly three months after the suit was commenced.

Being asked how often she heard him call plaintiff vile names before the divorce suit was commenced, Mrs. Albee answered: " I never heard him call her out of her name except this once. I heard him call her a whore but once. I never heard him call her a bitch. . . . . I remonstrated with him. I was very indignant, and I spoke to him about his conduct."

Plaintiff admitted that the defendant was an honest man in all his business transactions, and that he liberally supplied her and her children and niece. She complained of no unkindness when he was sober, and feared no physical violence from him when he was drunk. In their quarrels she appears to have been more than his match, though she could not descend to answer his profanity and obscenity in kind. While drunkenness was no excuse for calling her vile names under any circumstances, yet the injurious effect thereof upon her mind should not have been, and probably was not, so bad as if he had deliberately called her by those names when he was sober. No mental suffering produced by his drunkenness, merely, can be considered, because not complained of. (*Haskell* v. *Haskell*, 54 Cal. 262.) The mental suffering, caused by his words alone, can be considered in this case.

The finding that defendant called the plaintiff a whore

and a bitch, *in the presence and hearing of other people,* should be qualified by the admitted facts that none but the niece and her caller and the colored servant heard him call her out of her name, and that he was not aware that even they heard what he said, or that the caller upon the niece was in the house at the time. This seems material, as tending both to modify the otherwise apparent motive of the defendant, and to mitigate the alleged painful effect upon the mind of the plaintiff, as without this qualification it would appear that the defendant intended to defame the plaintiff in public estimation, which would indicate a worse motive on his part, and produce a more painful effect upon her mind than would the mere intention privately to annoy her, or to revenge himself for the fancied wrongs of having been barred out of her room and threatened with the police.

While the defamatory, obscene, and profane language of the defendant was wholly unjustified, inexcusable, and unmanly, it may be said that the conduct of the plaintiff was at least unkind and censorious, and tended to provoke anger and harsh language on the part of the defendant. It probably resulted from her ill temper, bad judgment, and a mistaken view of the duty of a wife under the circumstances. She probably deemed it her duty, by means of censure, reproach, and scolding, to make her husband "do what was right," and it seems that she faithfully, in season and out of season, applied such means. In this I think she was mistaken. Intemperate husbands are seldom, if ever, reformed by such treatment, whereas uniform kindness may often prove effectual, and never harmful; but should kindness fail, and the intemperance of the husband become habitual, the wife will be entitled to a divorce on that ground alone.

I think the judgment should be reversed, and the court below directed to render judgment for the defendant on

the findings, without costs, and that the appellant pay his own costs of the appeal.

BELCHER, C. C., and FOOTE, C., concurred.

The COURT. — For the reasons given in the foregoing opinion, the judgment is reversed, and the court below directed to render judgment for the defendant on the findings, without costs, and that the appellant pay his own costs of the appeal.

PATERSON, J., dissented.

McFARLAND, J., dissenting. — I dissent. It is possible that the judgment in this case might be reversed for want of sufficient proof of facts; but I dissent *in toto* from the views expressed in the opinion adopted by the majority of the court on the subject of extreme cruelty.

The opinion goes back to the old cases of *Morris* v. *Morris*, 14 Cal. 80, 73 Am. Dec. 615, and *Powelson* v. *Powelson*, 22 Cal. 362, and adopts their doctrine, that no conduct of a husband toward a wife constitutes extreme cruelty unless it *injures bodily health or endangers physical safety.* It treats a woman as having only a bodily structure and physical organs, like one of the lower animals, and utterly ignores her mental, moral, and emotional nature. Those cases, following musty decisions in the past, when women had few civil immunities which man was bound to respect, were determined before the present statutory law of California upon the subject and at a time when human rights, *as human rights*, were but dimly recognized, even in these free United States, and when extreme, and in some cases wholesale, violation of personal liberty was common against all except one class, viz., white *male* citizens. The theory of those cases is, that a husband may heap all sorts of wrongs upon a wife, short of beating or threats of personal violence; that his conduct toward her may be a continuous series of acts of

insult and contumely; that he may continuously call her vile names, and unjustly and falsely charge her, in the presence of others, with indecent acts and base practices, so that she is ashamed to look her neighbors in the face, and unable to find aught in life but misery, so that the common voice of mankind would call him cruel beyond all patience, and yet, as long as her physical constitution can bear up under the strain, she can get no redress. She must be a wreck before she can be rescued.

This doctrine makes legal cruelty depend, not on the misconduct of the husband, but on the endurance of the wife; not on the guilt of the wrong-doer, but on the vitality of the victim. The anguish of the mind must have eaten through the flesh and exhibited itself in bodily disease before there can be any legal evidence of cruelty. But some women, like some men, have inherited from sturdy ancestors physical constitutions so robust, with bone and blood, and muscle and nerve, and heart and lungs, so charged with vitality, that the woes of a Lear would not wear out the machinery or obstruct the currents of healthy physical life. Must such a woman suffer on forever, and only the weak who faint at a gentle reproach be relieved?

There is not, in my opinion, any necessity whatever to follow *Morris* v. *Morris* and *Powelson* v. *Powelson* as authorities; for, since they were decided, the statute law has been changed, and changed, I think, for the express purpose of obliterating those decisions. At that time the statute merely made "extreme cruelty in either party" a cause of divorce, without any attempt to define or describe it. (Hittell's General Laws, par. 2416.) But the code has added the following: "Extreme cruelty is the infliction of grievous bodily injury, *or grievous mental suffering*, upon the other by one party to the marriage." (Civ. Code, sec. 94.) Here "bodily injury" and "mental suffering" are mentioned as two entirely distinct things, and each, by itself, as constituting ex-

treme cruelty. If the legislature had merely meant bodily injury *caused by* mental suffering, there would have been no occasion for the legislation at all, because *that* was included clearly in the decisions in the Morris and Powelson cases. It is entirely evident, therefore, to my mind, that, both in a philologic and historical view, the language of section 94 means that the infliction of grievous mental anguish alone constitutes legal cruelty.

It is said that the definition of extreme cruelty in section 94 is defective. Of course, there cannot be a perfect definition of such a thing. The qualities of human actions cannot be designated by accurate lines, as fields can be by fences. Can grievous *bodily* injury be accurately defined? It is said that the infliction of grievous suffering does not imply wrong or injustice. But section 94 is dealing with extreme cruelty, and uses that phrase. And does not "extreme cruelty" itself imply wrong and injustice? And while extreme cruelty of either kind cannot, in the very nature of things, be accurately defined, there is often misconduct so far outside of and beyond that produced by the ordinary weaknesses and passions of men that the common judgment of mankind pronounces it extremely cruel. Every case where a divorce is sought on this ground must depend upon its own particular facts; and a correct decision must depend — as most cases depend — upon the sound sense and judgment of juries and courts. Some divorces are no doubt obtained upon insufficient proof; but it must be remembered that one reason why more divorces are granted than formerly is, because formerly wives had no remedy for many outrageous wrongs.

A petition for a rehearing having been filed, the following opinions were rendered thereon on the 1st of September, 1890 : —

WORKS, J. — A rehearing is denied. The petition in this case is discourteous and disrespectful in some of its

language.  However individual members of the court
may regard such conduct on the part of attorneys, as
affecting them personally, it is an offense against the
court that cannot be allowed to pass without rebuke.
An attorney who has a sufficient understanding of his
high calling, and the respect due to the court, as well as
the respect due to his profession, should not so far for-
get himself as to use such language.  Because of the im-
portant question presented, we have carefully considered
the points made, notwithstanding the manner in which
they were presented in the petition.  But having done
this, out of consideration for the better feelings of coun-
sel who filed it, as well as to prevent a recurrence of a
like offense, the objectionable language should not be
perpetuated as a part of the records of the court.  It is
therefore ordered that the petition for a rehearing be
and the same is hereby stricken from the files.

THORNTON, J., FOX, J., and SHARPSTEIN, J., concurred.

BEATTY, C. J., dissenting. — I did not participate in
the decision of this case, owing to want of opportunity
to examine it within the time allowed for a decision.
Since the petition for rehearing, I have considered it
carefully, and I am unable to concur in the judgment or
the order refusing a rehearing.  I think section 94 of
the Civil Code defines extreme cruelty, and that by such
definition it consists of either, — 1. The infliction of griev-
ous bodily injury; or 2. The infliction of grievous men-
tal suffering.  This definition was, I think, intended by
the legislature to be complete, and this conclusion is not
invalidated by what must be conceded to be true, viz.,
that the acts or words causing the mental suffering or
bodily injury must be not only intended but unjustifi-
able.  These qualities of the acts of cruelty are suffi-
ciently implied in the word "infliction."  In this view,
the finding of the superior court comes up to the law,

and nothing more can be required. The testimony, in my opinion, is sufficient to support the finding. It is possible that the application of the epithets testified to, by a man to his wife, in the presence of third parties, might not cause her grievous mental suffering, but on the other hand, they probably would; and in this case the superior court has found that they did, in fact, cause such suffering, unless this conclusion is negatived by the other fact found, that her bodily health was not affected. But this, in my opinion, was not essential as a test of the degree of suffering contemplated by the statute. While dissenting from the judgment of the court and the order refusing a rehearing, upon the grounds thus briefly indicated, I concur in the view that some of the language employed by counsel in their petition for rehearing was intemperate, and improper to go upon the records of the court.

McFarland, J., dissenting. — I dissent from the order denying a rehearing, and adhere to the views expressed in my former dissenting opinion. I concur in the views of the majority of the court as to the objectionable language used in the petition for rehearing.