[Civ. No. 14651. First Dist., Div. One. June 25, 1951.]

FRANCIS KRULL, Respondent, v. EVE AGNES KRULL, Appellant.

G. C. Ringole for Appellant.

M. Anderson Thomas for Respondent.

BRAY, J.—Plaintiff husband sued for divorce on grounds of extreme cruelty. Defendant wife answered, denying all charges and alleging recrimination. She also cross-complained for separate maintenance, alleging extreme cruelty. The court granted plaintiff an interlocutory decree of divorce, terminated a homestead declared by the defendant on plaintiff's separate property, and denied defendant all relief. A motion by defendant for a new trial was also denied. Defendant appeals.

## QUESTIONS PRESENTED

1. Insufficiency of evidence to support findings of extreme cruelty and lack of recrimination.
2. Findings not sufficient.
3. Alleged error in terminating the homestead.

## EVIDENCE

When the parties separated on June 7, 1948, they had been married two and three-quarters years. At the time of the marriage plaintiff was 73 years of age; defendant 54 or 56. There is neither issue nor community property. At the time of marriage plaintiff owned, and still owns, an apartment house in San Francisco, one apartment of which was occupied by the parties, and a small home in Indio, California. Plaintiff testified that shortly after the marriage he realized he had made a mistake as defendant was constantly after him about a will and that she tore one will to pieces; that she had a terrible temper and would frequently fly into a tantrum; that on many occasions she called him a "senile old fool." She would not acknowledge presents his sister sent her, and told him he could not have his sister visit them. However, when the sister did visit, he admitted defendant treated her "very nicely." Defendant opened his bank statement on one occasion and tore up his checks. On another occasion she swung a candlestick at him and then punched him in the back of the neck. She called him a Jekyll and Hyde and said he lied. In front of his nurse and doctor she said, "Why, you ought to be in Napa." Plaintiff had to do most of his own cooking. She had an inordinate vanity and he had to play up to it. He could not cross her in anything. She hid things of his such as candlesticks and a picture of which he was very fond. Often she went through his pockets and opened his letters. She had a psychiatrist come to the house to examine him without telling him about it. At first, he thought she had brought the doctor there to examine her. A number of other charges were made by plaintiff.

58

There were four incidents which were corroborated and were specifically found by the court. These follow. (1) About November 24, 1948, the parties were at Indio. Plaintiff testified that he then told defendant he was coming to San Francisco to look after the apartment house. She did not want him to come. ''She said that I was coming to consult Dr. Rubenstein, who was giving me dope. He was using dope, and I could not get along without it. She became very angry, and called me a senile old fool, and that I was insanely jealous of her.'' This conversation was corroborated by plaintiff's sister, who also testified that defendant told her she was going to the medical board and have the doctor's license taken away for giving plaintiff dope. (2) In the spring of 1948 occurred the so-called ''Finney incident.'' Finney is the first name of the husband of a woman friend of both parties. They evidently were very fond of her. Plaintiff did not like Finney. Shortly after the death of Finney's wife, and while plaintiff was at Indio and defendant at their San Francisco apartment, Finney came to the apartment. Plaintiff first learned of the Finney incident about a year after it had happened. Mrs. Frances Brackett, a friend of both parties, phoned the apartment to talk to defendant. Defendant was out of the apartment and plaintiff answered the phone. In the course of the conversation Mrs. Brackett told plaintiff substantially what she later testified, namely, that late one night she was awakened by a phone call from defendant, who said that she was in an awful predicament; that Finney had come in drunk ''and I am solely alone. I don't know what to do.'' Defendant put him in plaintiff's bed and he messed it. (Later defendant told Mrs. Brackett that she had no right to relate the incident to plaintiff.) Immediately plaintiff asked defendant about it. Defendant admitted Finney was there, but said that a Mrs. Durance brought him in and said he was going to commit suicide; that defendant's brother and a Mrs. Benton were present. Finney started to cry and defendant told him to go in the bedroom and cry it out. Finney went in, got in bed, slept for a while, befouled the bed, and woke up. Defendant told him to take a bath, which he did, and then left. Plaintiff did not believe defendant's story; he thought his wife had a ''yen'' for Finney. Defendant told plaintiff that the reason she kept the incident secret was because her brother told her to do so.

(3) Plaintiff testified that defendant ignored plaintiff's sister, refused and neglected to acknowledge presents received by her from the sister, and told plaintiff the sister

could not visit him at the San Francisco apartment and angrily objected thereto. Most of this was corroborated by the sister.

(4) Plaintiff testified that on numerous occasions defendant called him "a senile old fool" and treated him with contempt and disrespect. Plaintiff's sister testified that more than once defendant angrily called him a senile old fool in her presence and also told her in his absence that plaintiff was a senile old fool; that she was always nagging at him about something—always wanting money and being angry when she did not get it; that this conduct affected plaintiff's health.

Defendant testified that plaintiff became a changed person after he met Dr. Rubenstein; denied tearing up the will or keeping after him about one. She either denied or explained all of the charges made by plaintiff. She explained the "dope" incident by saying that the shots Dr. Rubenstein gave plaintiff (Dr. Rubenstein testified he occasionally gave plaintiff injections of digitalis and also vitamin B complex as plaintiff was suffering from a form of myocardosis) so elevated plaintiff that he was a changed personality and defendant felt they were bad for plaintiff's health; ". . . the reaction from the shots was simply terrific." Defendant denied that she ignored plaintiff's sister and stated that plaintiff had told her she need not write and thank the sister for the presents as he would do it. Defendant denied calling plaintiff a senile old fool except on the occasions when he brought up the Finney incident, doubted her version of it and charged her with sleeping with Finney.

As to recrimination, defendant testified that plaintiff was penurious and became angry whenever she asked him for money to run the house, when needed above the $100 per month allowance; that he had dragged her by the hair; that he falsely accused her of intimacy with Finney. Corroboration of defendant's version of most of these matters was given by her brother, a Mrs. Baccari, and defendant's sister. Dr. Bonfilio testified to red marks on defendant's neck which defendant claimed plaintiff caused.

### SUFFICIENCY OF THE EVIDENCE

This was a bitterly contested case. The testimony was directly conflicting. Plaintiff's main corroboration came from his sister. Defendant, in number of witnesses, had more corroboration of her story. However, the trial court saw the witnesses and chose to believe plaintiff's version as against defendant's. That was its province. Plaintiff's testimony

and that of his sister was ample to support the findings. Defendant's main contention on this point seems to be that as defendant gave plausible explanations, the trial court must accept them. The court, of course, was not bound to do so. Nor was the court bound by the testimony of the psychiatrist who testified that plaintiff had delusions and could not be considered competent to be a witness. The record indicates that plaintiff was a competent witness and that the alleged delusions were not delusions at all. For example, one of the claimed delusions was plaintiff's belief that defendant was unduly interested in Finney. In view of the information Mrs. Brackett gave plaintiff, he was justified in believing this, even though his wife denied it. ''Considering the question as to whether the evidence is sufficient to sustain the findings of the court as to the facts upon which the decree of divorce is based, we are not permitted to weigh testimony and determine as to where the preponderance lies, for in the presence of a conflict such as appears here upon most of the issues, the determination of the trial judge as to facts must be deemed conclusive. The evidence then must be viewed from the standpoint that will give to it the strongest weight in sustaining the findings of the court.'' (*Van Camp* v. *Van Camp*, 53 Cal.App. 17, 20 [199 P. 885].) As to most of the contentions made by defendant herein, the language of *Allin* v. *Snavely*, 100 Cal.App.2d 411, 415 [224 P.2d 113], is most appropriate: ''She argues as though the court had adopted her evidence which is not the fact.'' The evidence fully supports the findings.

### CORROBORATION

■ Apparently defendant contends that in a divorce action all of the acts of cruelty must be corroborated. This is not the law. ''It is true that some of the charges made by respondent were not corroborated, but this is not required under the law of this state. A single act of cruelty, if corroborated, even where it consists of making an unfounded charge or false imputation, is sufficient. (See cases collected 9 Cal.Jur. p. 661, § 34.) It is not required that the evidence be corroborated as to every fact and circumstance appearing in the record. If there is corroborative evidence of one or more facts which is, or are, sufficient to show cruelty, that is sufficient. (See cases collected 9 Cal.Jur. pp. 737 and 738, §§ 95 and 96.)'' (*Ungemach* v. *Ungemach*, 61 Cal.App.2d 29, 34 [142 P.2d 99].) (See also *Bradley* v. *Bradley*, 94 Cal. App.2d 310 [210 P.2d 537, 211 P.2d 638].)

## Findings Are Sufficient

█ The court found that for a period of approximately two years prior to the commencement of the action defendant wrongfully treated plaintiff in a cruel and inhuman manner, and that such acts on the part of defendant rendered the further continuance of the marriage relation impossible and intolerable; "that in part the defendant and cross-complainant has done the following enumerated acts and things" which constitute extreme cruelty. It then finds the four specific matters hereinbefore detailed. Defendant takes each one of these four specific findings, points out her explanation of it, and then contends that the finding must fall. Thus, on the dope incident she contends that she was in good faith in saying that Dr. Rubenstein was administering dope to plaintiff, as the evidence shows he was injecting medicine intravenously. The explanation, however, overlooks the significant point in plaintiff's version of the incident, which the court found as true, namely, that defendant was accusing him of wanting to go to San Francisco just to get dope and that he could not get along without it. Although plaintiff was being treated by the doctor, there is no evidence in the case (not even defendant's explanation) to support defendant's accusation either that it was his only reason for going to San Francisco or that he could not get along without the injections.

The situation here is entirely different from that in *Nason* v. *Nason,* 48 Cal.App.2d 500 [120 P.2d 37], where the trial court held that the statement of the wife to her physician did not constitute cruelty towards the husband. There, admittedly, the husband prior to the marriage had taken treatments for a venereal disease. He claimed these treatments were merely precautionary. Almost a year after the marriage plaintiff learned that the wife was being given salversan shots by her physician. On asking the latter why these shots were given the physician stated that the wife had informed him that she had gone to the husband's doctor and by him had been informed that the husband had a 1 plus Wasserman. The physician said that he might have told her the husband had a 1 plus Neisserian fixation test. The appellate court held that the statement made by the wife to her doctor in confidence based upon her understanding of what the husband's physician had told was made only for the protection of herself and her unborn child, and not for the purpose of injuring the husband or his reputation—obviously an entirely different

situation than the one in the case at bar. Here defendant was accusing plaintiff in effect of being a dope addict.

Again, as to the Finney incident—assuming that there were present at the apartment the witnesses who claimed to have been there (the court did not have to believe them in view of the testimony of Mrs. Brackett that defendant called her the night of the incident, told her she was alone with Finney and asked her advice as to what to do)—the important thing is that defendant concealed this incident from plaintiff. Defendant attempts to make light of it because, during cross-examination, plaintiff, who all along was not convinced that defendant was truthful in saying that the brother was present, finally stated that he now believed the brother to have been present. This does not change the fact that defendant, knowing that plaintiff disliked Finney, failed to make a disclosure of the incident until plaintiff found out about it elsewhere.

Plaintiff was grievously hurt by defendant's attitude towards his sister. Defendant contends that there was a cordial relationship between her and the sister. This is based on the fact that when the sister actually visited the parties defendant treated her, according to plaintiff, "very nicely." However, that fact did not overcome the effect on plaintiff of defendant's real attitude towards the sister. It may be that a wife is not required to exhibit any great fondness for a husband's relative and that this incident must be entirely disregarded in determining the question of cruelty. If so, other grounds remain which amply support the court's finding.

Defendant brushes off the court's finding that on numerous occasions defendant called plaintiff a senile old fool and treated him with contempt and disrepect, as being minor occurrences. This finding alone is sufficient to support the court's determination that defendant's actions towards plaintiff caused plaintiff mental suffering and constituted cruelty. The matters set forth in at least three of the four specific findings were sufficient to support the judgment. It must be remembered, too, that in addition to these four specific findings the court found that for approximately two years defendant wrongfully treated plaintiff in a cruel and inhuman manner and that the acts mentioned in the specific findings were only "in part" the acts upon which the judgment was based. "Whether in any given case there has been inflicted this 'grievous mental suffering' is a pure question of fact, to be deduced from all the circumstances of each particular case, keeping always in view the intelligence, apparent refinement,

and delicacy of sentiment of the complaining party; and no arbitrary rule of law as to what particular probative facts shall exist in order to justify a finding of the ultimate facts of its existence can be given. As said by Mr. Justice McFarland, in his dissenting opinion in *Waldron* v. *Waldron,* 85 Cal. 251 [24 P. 649, 858, 9 L.R.A. 487] : 'Every case where a divorce is sought on this ground must depend upon its own particular facts; and a correct decision must depend—as most cases depend—upon the sound sense and judgment of juries and courts.' '' (*Barnes* v. *Barnes,* 95 Cal. 171, 177 [30 P. 298, 16 L.R.A. 660].)

## RECRIMINATION

■ Defendant contends that the defense of recrimination should have been sustained. While the defendant's evidence on this subject was such that had the court believed it, the defense would have been sustained, the trial court, exercising its prerogative in observing the witnesses, did not believe it. Plaintiff admitted that on one occasion he had pulled defendant's hair. He explained that defendant would not let him in the apartment, and that the only way he could get in was to take her by the hair and pull her away from the door. He stated that in so doing he may have scratched her. Dr. Bonfilio testified that when he saw defendant shortly after this incident defendant had some red marks on her neck. The trial court evidently believed plaintiff's version of this incident. The incident was not sufficient to deny a divorce to one otherwise entitled to it. ''The question as to whether the physical violence used by one spouse will bar that spouse from securing a divorce, or whether the provocation by the other spouse will excuse the physical violence, is primarily a question of fact. Each case must be determined on its own facts. The trial judge, having the opportunity to see and hear the witnesses, is best able to ascertain whether the physical violence used was induced by the other spouse, or whether, under the circumstances, it was out of proportion to the provocation.'' (*Popescu* v. *Popescu,* 46 Cal.App.2d 44, 50 [115 P.2d 208].) ''Appellant presents the further points that defendant should have been granted a decree of divorce on his cross-complaint, or at any rate that the evidence 'shows recrimination in bar of plaintiff's cause.' With reference to such matters, it need only be said that the entire evidence in this action was before the judge of the trial court and that it was his exclusive province to determine where lay the truth. His findings of fact on the evidence were entirely against the contention of de-

fendant. They are conclusive on this court." (*Sherman* v. *Sherman*, 81 Cal.App. 406, 409 [253 P. 945].)

The evidence gives a picture of an elderly man of a rather proud disposition, married to a woman much younger than he, who was highly impatient with him, who constantly nagged him, and who believed that he actually was senile and treated him as such. The record shows that she had him examined for the purpose of having an insanity warrant issued, and later tried to have a guardian *ad litem* appointed to represent him in this action. On occasions she took articles of his which she knew he wanted near him and locked them in her room. Even under her testimony there was constant friction between them. A reasonable inference from the evidence, which undoubtedly the trial court drew, is that having married a man of considerable means, and although treating him in a manner causing him mental suffering, she did not want to let go of the security which his means gave her. This fact appears, even though during her married life she used the $3,000 which she brought into the marriage, and did not draw, as she could have, on the joint bank account.

## HOMESTEAD

■ Defendant recorded a declaration of homestead on the apartment house property, one apartment of which was occupied by the parties as their home. This property admittedly is the separate property of plaintiff. In the interlocutory decree the trial court ordered this homestead terminated and ordered defendant to remove from the apartment and the property. The decree does not specify when the termination is to be effective and when defendant must remove. As said in *Leavitt* v. *Leavitt*, 134 Cal.App. 145, 146 [24 P.2d 910] : "The interlocutory decree is not a decree of divorce nor does it dissolve the marriage. The court, therefore, should not have limited appellant's right to the occupancy of the homestead until such time as the marriage shall be dissolved by the final decree." Therefore, the interlocutory decree must be construed as providing that the termination of the homestead and the requirement that defendant remove from the premises is not effective until the entry of a final decree of divorce herein.

The judgment is affirmed.

Peters, P. J., and Agee, J. pro tem., concurred.

A petition for a rehearing was denied July 13, 1951, and appellant's petition for a hearing by the Supreme Court was denied August 23, 1951.